UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE LARAMAR GROUP, LLC, and LARAMAR MANAGEMENT SERVICES, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> GA BELDEN LLC, <br><br> Defendant. | ) <br> ) <br> ) 20 C 1815 <br> ) <br> ) Judge Gary Feinerman <br> ) <br> ) <br> ) <br> ) <br> ) |

### MEMORANDUM OPINION AND ORDER

The Laramar Group, LLC and Laramar Management Services, LLC (together, "Laramar") managed a building owned by GA Belden LLC. When Belden sold the building, Laramar incurred costs arising from the operation of federal pension law. Laramar alleges in this diversity suit under Illinois law that Belden must reimburse it for those costs. Doc. 9. Belden moves under Civil Rule 12(b)(6) to dismiss the operative complaint. Doc. 24. The motion is denied.

### Background

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Laramar's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Laramar as those

1

materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

In December 2013, Laramar began to manage the Belden-Stratford, a residential apartment building in Chicago owned at the time by Belden. Doc. 9 at ¶¶ 1-2, 14-15. The relationship between Laramar and Belden was governed by an Apartment Management Agreement ("AMA"). *Id*. at ¶¶ 2-3; Doc. 33 at 4-75. The AMA required Belden to indemnify Laramar for certain costs arising from Laramar's services as the building's manager. Doc. 9 at ¶ 3; Doc. 33 at 46, § 13.8. With Belden's approval, Laramar entered into various collective bargaining agreements ("CBAs") with unions representing employees who worked at the building. Doc. 9 at ¶¶ 16, 39. Two of the CBAs are relevant here, one with UNITE HERE and the other with SEIU. *Ibid*.; Doc. 33 at 76-114 (UNITE CBA); *id*. at 120-151 (referencing the SEIU CBA).

Under the UNITE CBA, Laramar began making contributions to a multiemployer pension plan in November 2017, and regularly sought and received from Belden reimbursement for those contributions. Doc. 9 at ¶¶ 16-18. In December 2018, Belden sold the building, terminated the AMA, and directed Laramar to assign the CBA to the building's buyer. *Id*. at ¶ 19. The assignment triggered Laramar's withdrawal from the pension plan and the potential assessment of withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq*. Doc. 9 at ¶¶ 20-21.

In the leadup to the sale, Belden assured Laramar that it would pay the assessed withdrawal liability. *Id*. at ¶ 23. On November 29, 2018, Laramar sent Belden the pension plan's estimate of the withdrawal liability—approximately $1.2 million—and asked Belden to

confirm that it would pay whatever sum was ultimately assessed. *Id*. at ¶ 22; Doc. 33 at 117-119. The next day, Belden reserved up to $1.5 million in an escrow account for the purpose of paying that and any other liability to Laramar arising from the building's sale. Doc. 9 at ¶ 25. On December 6, Belden sent Laramar an email stating: "Once we get the final calculation after closing, we can payoff [sic] the obligation." *Id*. at ¶ 23; Doc. 33 at 116. And Belden confirmed its commitment to pay the withdrawal liability during a telephone conference on December 12, shortly before the sale closed. Doc. 9 at ¶ 23.

Based on Belden's assurances that it would pay the withdrawal liability and its past reimbursement for pension plan contributions made by Laramar, Laramar believed that Belden would arrange for the payment of any withdrawal liability arising from the sale. *Id*. at ¶ 24. Consistent with that understanding, Laramar did not take any steps to shield itself in whole or in part from withdrawal liability. *Id*. at ¶¶ 55-59. Despite its assurances, Belden did not arrange to pay off the withdrawal liability, and the pension plan assessed Laramar a sum of $1.2 million, to be paid off in quarterly installments over twenty years, with the initial payment due in May 2019. *Id*. at ¶¶ 26-27.

Laramar forwarded the assessment to Belden and made certain quarterly and interest payments to minimize the costs associated with the assessment. *Id*. at ¶ 28. Because Belden took no action to settle the withdrawal liability, the pension plan filed suit against Laramar in the Southern District of New York. *Id*. at ¶ 29. Laramar retained counsel, apprised Belden of the suit, solicited its assistance, and sought its approval of a proposed settlement offer. *Id*. at ¶¶ 30-31. On September 20, 2019, Belden told Laramar that it would not pay the withdrawal liability. *Id*. at ¶ 32. Laramar responded with a formal demand "that [Laramar] be indemnified pursuant to the [AMA] or otherwise for all losses and costs" stemming from the assessment and the

3

lawsuit, and it advised Belden of its intention to negotiate and execute a settlement with the pension plan. *Id*. at ¶ 33. Belden did not budge. *Id*. at ¶ 35. In February 2020, Laramar settled the lawsuit for $711,469.78, all the while incurring about $60,000 in legal fees. *Id*. at ¶¶ 37-38.

Also in February 2020, Laramar learned that it had been assessed $71,000 in withdrawal liability from the pension plan associated with the SEIU CBA. *Id*. at ¶ 39; Doc. 33 at 120-151. Like the UNITE assessment, the SEIU assessment arose from Belden's decision to sell the building, terminate the AMA, and direct Laramar to assign the CBAs to the building's purchaser. Doc. 9 at ¶¶ 39, 41. Belden refuses to pay the SEIU assessment as well. *Id*. at ¶ 40. In an effort to mitigate indemnifiable losses, Laramar has engaged counsel to challenge the assessment. *Ibid*.

## Discussion

The operative complaint has three counts, which are addressed in turn.

**I.     Count I (Contractual Indemnity)**

Count I, which sounds in breach of contract, alleges that Belden must reimburse Laramar for the withdrawal liability and related costs it incurred in connection with the UNITE assessment, as well as the costs it has expended in challenging the SEIU assessment. *Id*. at ¶¶ 42-51. The claim rests on the indemnification clause in Section 13.8 of the AMA, Doc. 9 at ¶ 44, which states in relevant part:

> **13.8 Indemnification.** … Owner [Belden] agrees to indemnify, defend and hold harmless Manager [Laramar] and its shareholders, directors, officers and employees from any Loss … sustained or incurred by or asserted against any one or more of them relating to the Property or by reason of or arising out of the duties, obligations and responsibilities assigned to Manager in this Agreement or the performance by Manager of its obligations under this Agreement, except to the extent the same arises out of Manager's Misconduct (as defined below). THE INDEMNITIES BY OWNER … IN THIS SECTION 13.8 SPECIFICALLY APPLY TO NEGLIGENCE AND EVENTS FOR WHICH THERE IS STRICT LIABILITY BY THE INDEMNIFIED PERSONS, TO THE EXTENT THE RESULTING LOSS IS WITHIN THE SCOPE OF THE INDEMNITY. As used in this Section 13.8, "Manager's Misconduct" means (i) acts by Manager or its agents or employees outside the scope of Manager's authority under this

4

>Agreement, or (ii) the gross negligence or intentional misconduct of Manager or its agents or employees. …

Doc. 33 at 46, § 13.8.  Section 13.8 broadly defines "Loss" to include "any and all direct or indirect damages … assessments, losses, liabilities, costs and expenses, including, without limitation, penalties, interest on any amount payable to a third party, lost income and profits, and any legal or other expenses (including, without limitation, reasonable attorneys' fees and expenses)." *Id*. at 54.

Laramar claims that withdrawal liability and related expenses are losses subject to Belden's indemnification obligation because Laramar incurred them "by reason of or arising out of … the performance by [Laramar] of its obligations under [the AMA]." Doc. 41 at 20-21 (quoting Doc. 33 at 46, § 13.8); Doc. 49 at 2-3.  One such duty was Laramar's obligation under Section 11.6 to assist Belden with the building's sale.  Doc. 41 at 20-21; Doc. 49 at 2-3.  Section 11.6 required Laramar to "use all reasonable efforts to cooperate with [Belden] to accomplish an orderly transfer of the operation and management of the Property to a party designated by [Belden]." Doc. 33 at 43-44, § 11.6.  Section 11.7, in turn, provided that "[Belden] will assume responsibility for payment of all unpaid bills approved or authorized by [Belden] and received by [Belden]." *Id*. at 44, § 11.7.  According to Laramar, it assigned the UNITE and SEIU CBAs to the building's buyer pursuant to its Section 11.6 duties.  Doc. 41 at 20-21; Doc. 49 at 2-3, 6.  Because that assignment triggered the withdrawal liability, Laramar maintains, Sections 11.7 and 13.8 require Belden to pick up the tab.  Doc. 41 at 8-9, 18-21, 24; Doc. 49 at 2-3, 6.

Pressing the contrary view, Belden contends that an indemnification provision may be read to require one party to indemnify another party for pension plan withdrawal liability only if the provision expressly imposes that obligation.  Doc. 26 at 17-19; Doc. 43 at 2, 4-6.  The law imposes no such clear statement rule.  Belden's principal authority, *Transpersonnel, Inc. v.*

5

*Roadway Express, Inc.*, 422 F.3d 456 (7th Cir. 2005), holds only that a firm that leases employees from their employer is not itself an "employer" for purposes of the MPPAA—meaning that the firm is not directly responsible *under the statute* for paying withdrawal liability—even if the firm reimbursed the contributions that the employer made to the employees' union's pension fund. *Id*. at 460-62. The Seventh Circuit did not resolve whether the parties' *indemnification agreement* required the firm to reimburse the employer for withdrawal liability imposed under the MPPAA. *Id*. at 459 & n.2.

The other cases cited by Belden, which have persuasive value only, do not advance its cause. In *Transport Drivers, Inc., v. Coca-Cola Refreshments USA, Inc.*, 2018 WL 3682513 (D. Minn. Aug. 2, 2018), Coca-Cola's contract to lease truck drivers from a transport services company included a provision that expressly required Coca-Cola to reimburse the company for pension plan contributions it made to the drivers' union's pension fund. *Id*. at *2, 10. The court held that the contract did not obligate Coca-Cola to reimburse the company for a withdrawal liability assessment, reasoning that "even if [Coca-Cola] had an obligation to reimburse [the company] for its ongoing pension costs, this would not create a contractual reimbursement obligation for withdrawal liability absent an express agreement with respect to this particular cost." *Id*. at *10. In context, the reference to "an express agreement" does not adopt the clear statement rule urged by Belden; rather, it simply applies the *expressio unius est exclusio alterius* canon to hold that a contract expressly requiring one party to reimburse the other party for payment of pension plan contributions cannot be read to also require reimbursement of withdrawal liability payments. *See also Call Henry, Inc. v. United States*, 125 Fed. Cl. 282, 286 (2016) (holding that an agreement that required one party to reimburse the other party for

employee fringe benefits did not cover withdrawal liability payments, reasoning that withdrawal liability is not a fringe benefit), *aff'd*, 855 F.3d 1348 (Fed. Cir. 2017).

Absent a clear statement rule, ordinary principles of Illinois contract law govern whether the AMA requires Belden to reimburse Laramar for its withdrawal liability payments and related expenditures. "[A]n indemnity agreement must be given a fair and reasonable interpretation based upon a consideration of all of its language and provisions." *Open Kitchens, Inc. v. Gullo Int'l Dev. Corp.*, 466 N.E.2d 1313, 1315 (Ill. App. 1984) (internal quotation marks omitted). At the pleading stage, the court's task is "to decide whether the [AMA's] clear and explicit language require[s] indemnification, … [whether] … it [i]s ambiguous," or whether it clearly and explicitly does *not* require indemnification. *CHA v. Fed. Sec., Inc.*, 161 F.3d 485, 487 (7th Cir. 1998). Belden is entitled to dismissal of Laramar's contractual indemnity claim only if the AMA clearly and explicitly does *not* require that Belden indemnify Laramar for its withdrawal liability payments and related expenses. *See Lovellette v. S. Ry. Co.*, 898 F.2d 1286, 1291 (7th Cir. 1990) (holding that a contractual indemnity claim could not be dismissed under Rule 12(b)(6) because the court could not "say [that] the indemnity clause unambiguously excludes … the present dispute from its coverage").

Belden contends that Section 13.8 does not apply here because pension plan withdrawal liability is not an obligation "arising out of" Laramar's duties under the AMA, but rather one arising from the MPPAA. Doc. 26 at 19-20, 22; Doc. 43 at 5-6. This misunderstands Laramar's position. Laramar does not, and could not, argue that Belden is directly liable under the MPPAA as an "employer." *See Transpersonnel, Inc.*, 422 F.3d at 460-62. Laramar instead claims that the withdrawal liability arose from fulfilling its duty under Section 11.6 to facilitate Belden's

7

sale of the building by complying with Belden's instruction to assign the CBAs to the building's buyer. Doc. 41 at 19-21; Doc. 49 at 2-3.

Belden next contends that Section 2.7, which imposes employment-related obligations on Laramar, defeats the proposition that Section 13.8 obligates Belden to reimburse Laramar for withdrawal liability payments. Doc. 26 at 21-22. Section 2.7 assigns to Laramar responsibility for "[a]ll matters pertaining to the employment, supervision, compensation, promotion[,] and discharge of" employees, provides that Laramar "shall indemnify" Belden for any costs arising out of the violation of laws "having to do with [Laramar's] employees," and adds for good measure that "[a]ll employment arrangements are solely [Laramar's] concern." Doc. 33 at 22-23, § 2.7(A)-(B). Belden reads Section 2.7 to impose responsibility on Laramar for *all* employer-employee related subjects, and if Belden were right, then payment of MPPAA-mandated withdrawal liability would be Laramar's obligation. Doc. 26 at 21-22.

Belden's reading of Section 2.7, however, is overbroad. For example, Belden's reading cannot be reconciled with Sections 6.3 and 6.7, which expressly require Belden to reimburse and indemnify Laramar for "gross salary and wages … federal and state unemployment taxes, social security taxes, group medical and health insurance premiums, worker's compensation insurance and other benefits of [Laramar's] employees." Doc. 33 at 32, § 6.3; *id*. at 34-35, § 6.7. It follows that Section 2.7 must be read in the context of, and harmonized with, other AMA provisions imposing employment-related obligations on Belden. *See In re Halas*, 470 N.E.2d 960, 964 (Ill. 1984) ("It is fundamental in contract construction that, if possible, effect must be given to all of the language so that provisions which appear to be conflicting or inconsistent may be reconciled and harmonized.").

In an effort at harmonization, Belden argues that Section 2.7, as a specific provision making Laramar responsible for "[a]ll employment arrangements," takes precedence over Belden's general obligation under Section 13.8 to indemnify Laramar for unspecified costs incurred in fulfilling its AMA duties, including those under Section 11.6. Doc. 48 at 5; *see Brzozowski v. N. Tr. Co.*, 618 N.E.2d 405, 408-09 (Ill. App. 1993) ("[W]here ambiguities exist in a contract between two provisions, the more specific provision relating to the same subject matter controls over the more general provision."). But it is just as plausible, as Laramar argues, that Section 11.6 is the more specific provision because it concerns the precise set of circumstances at issue here—Laramar's duty to facilitate Belden's sale of the building. Doc. 49 at 2-3, 6; *see Glaviano v. Allstate Ins. Co.*, 35 F. App'x 493, 496 n.2 (9th Cir. 2002) (holding that the specific-general rule of contract construction "ha[d] little application to th[e] case [before the court,] as it [was] unclear which of the policy provisions should be considered the more specific"). The apparent dissonance between Section 2.7, on the one hand, and Sections 13.8 and 11.6, on the other, thus results in an ambiguity that precludes judgment in Belden's favor on the pleadings. *See Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1104 (7th Cir. 1997) (recognizing that, under Illinois law, "ambiguities in the language of a contract regarding the parties' intent create a question of fact" that cannot be resolved on a motion to dismiss).

Belden next argues that its directing Laramar to assign the CBAs to the building's buyer did not actually trigger the assessment of MPPAA withdrawal liability. Doc. 48 at 2-4. In Belden's telling, the assessment sprung instead from the "automatic[] and immediate[]" termination of the AMA under Section 11.4 "upon [the building's] sale." Doc. 33 at 43, § 11.4. More specifically, Belden contends that the AMA's termination caused Laramar's "complete

9

withdrawal" from the pension plan because Laramar's duties to manage the property and contribute to the plan ceased at that point. Doc. 48 at 3-4 (quoting 29 U.S.C. § 1381(a)).

Belden's argument may ultimately win the day on a complete record, but it cannot prevail as a matter of law on the pleadings. The complaint alleges that Belden's sale of the building—even assuming it prompted the AMA's termination—could have been structured in a way that did not result in the assessment of withdrawal liability, such as by posting a bond guaranteeing the continued payment of certain contributions to the pension plan. Doc. 9 at ¶¶ 55-58. That allegation must be assumed true on a Rule 12(b)(6) motion, *see Pierce*, 818 F.3d at 277, and if it is true, then the AMA's automatic termination under Section 11.4 upon the building's sale did not trigger the assessment of withdrawal liability.

Finally, Belden argues that Section 13.8 cannot require indemnification for the SEIU assessment because that assessment was based on withdrawal liability that Laramar incurred in December 2016, years before the building's sale. Doc. 48 at 4-5. Again, the facts may ultimately prove Belden right, but at this stage, the court must credit the complaint's well-pleaded allegation that the SEIU assessment "was caused by Belden's decision to sell the … [b]uilding." Doc. 9 at ¶ 41.

In sum, Belden's motion to dismiss the contractual indemnity claim is denied.

**II.     Promissory Estoppel Claim**

In the alternative to its contractual indemnity claim, Laramar alleges that Belden must reimburse it on a promissory estoppel theory for the withdrawal liability payments and related costs it incurred in connection with the building's sale. *Id*. at ¶¶ 52-61. Specifically, Laramar alleges that Belden's oral and written representations "that [it] would be responsible for and take care of … any withdrawal liabilities" were promises on which Laramar reasonably and justifiably relied to its detriment. *Id*. at ¶ 53. The elements of a promissory estoppel claim under

10

Illinois law are: "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendant[], and (4) plaintiff relied on the promise to its detriment." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 827 (7th Cir. 2015) (quoting *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523-24 (Ill. 2009)) (internal quotation marks omitted).

Belden first argues that the existence of a valid contract between it and Laramar—the AMA—precludes the promissory estoppel claim. Doc. 26 at 24-25; Doc. 43 at 6-8. True enough, the existence of a valid contract defeats a promissory estoppel claim arising from a matter governed by the contract. *See All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999) ("When there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill."). But Rule 8(d)(3) provides that a plaintiff "may state as many separate claims … as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). That includes contract and promissory estoppel claims, so long as the plaintiff "[does] not include allegations of an express contract which governs the relationship of the parties[] in the count[] for … promissory estoppel." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) (quoting *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. 2005)). Laramar complied with that requirement, as its promissory estoppel claim does not incorporate any portion of its contractual indemnity claim, including the portion alleging that the AMA governs Belden's obligation to reimburse Laramar for the withdrawal liability assessments and related expenses. Doc. 9 at ¶ 52 (realleging ¶¶ 1-41 only, not the contractual indemnity claim at ¶¶ 42-51). At some point, the promissory estoppel claim will have to yield to the contract claim, or vice versa, but the litigation is not yet at that point.

11

Belden next argues that the complaint fails to allege facts establishing the elements of a viable promissory estoppel claim. Doc. 26 at 26-31. As for the unambiguous promise element, Belden contends that the oral and written assurances it made to Laramar were so vague that Laramar could not reasonably have relied upon them. *Id*. at 26-27. The reason, Belden submits, is that any promise it made was in response to the "estimate" of withdrawal liability forwarded by Laramar in late November 2018. *Ibid*. Belden's argument fails to persuade, as a promise is not "ambiguous"—at least at this early stage of the litigation—merely because it is "based on some contingency." *Derby Meadows Util. Co., Inc. v. Inter-Continental Real Estate*, 559 N.E.2d 986, 995 (Ill. App. 1990) (recognizing that "the ambiguity of the promise or the fact that it was based on some contingency" is a "factual determination" left to the trier of fact "following consideration of the evidence"). That is particularly so here, as Belden's promise expressly accounted for the occurrence of a future event, namely, the determination of a final withdrawal liability amount. Doc. 9 at ¶ 23 ("Once we get the final calculation after closing, we can payoff [sic] the obligation."); *cf*. *Demos v. Nat'l Bank of Greece*, 567 N.E.2d 1083, 1087 (Ill. App. 1991) (finding ambiguous a promise to lend money that did not specify the interest rate).

The complaint also sufficiently alleges that Laramar relied on Belden's promise and that such reliance was expected and foreseeable. Specifically, Laramar alleges that Belden's promise to take care of any withdrawal liability, along with its custom of reimbursing Laramar for pension plan contributions, led Laramar to "forbear from seeking to negotiate" with Belden, the plan, and the building's buyer "to avoid or reduce the amount of withdrawal liability." Doc. 9 at ¶¶ 23-24, 56. An entity in Laramar's shoes would have had every reason to rely on these assurances. *Id*. at ¶ 23. Belden disputes that Laramar's reliance was foreseeable on the ground that any promise in Belden's December 6, 2018 email contradicted the AMA's express terms

12

and, to boot, did not "did not satisfy the contractual requirements for modification" of the AMA. Doc. 26 at 27-28. This argument errs twice over. As noted, the AMA does not clearly state that withdrawal liability cannot be indemnified. And for purposes of its promissory estoppel claim, Laramar does not allege that Belden's "payoff" assurances amended the AMA, but rather that those assurances stand independent of the agreement. Doc. 41 at 27 n.10.

As to whether Laramar relied on Belden's promises to its detriment, the complaint plausibly alleges that Laramar would have taken steps to avoid or mitigate the assessment of withdrawal liability were it not for Belden's assurances. Doc. 9 at ¶¶ 55-58. Belden submits that any such steps would have been futile, but that argument presents a factual question that cannot be resolved in Belden's favor on the pleadings.

### III.  Declaratory Judgment Claim

Laramar seeks a declaration under 28 U.S.C. § 2201 that Belden is obligated to pay: (1) the SEIU assessment, either pursuant to the AMA or on promissory estoppel grounds; and (2) any additional liabilities that may result under the UNITE or SEIU CBA if several employers withdraw from their plans at or near the same time. *Id*. at ¶¶ 62-66. Belden seeks dismissal of both components of the claim.

As to the first, Belden argues that a declaratory judgment regarding the SEIU assessment is unnecessary because Laramar's substantive claims for breach of contract and promissory estoppel will resolve the dispute. Doc. 26 at 31; Doc. 43 at 8. Those claims, however, seek retrospective relief for the expenses Laramar has already incurred, while the declaratory judgment claim seeks prospective relief concerning sums it may incur in the future. Doc. 41 at 28. In any event, because discovery on all these claims will be coextensive, no efficiencies will result from the dismissal of that component of the declaratory judgment claim.

13

As to the claim's second component, Belden argues that a "mass withdrawal" event is unlikely. Doc. 26 at 32; Doc. 43 at 8. But the complaint alleges that there is a "real and concrete possibility" that such an event may occur, Doc. 9 at ¶ 64, and the court must accept that well-pleaded allegation at this stage.

## Conclusion

Belden's motion to dismiss is denied. It shall answer the operative complaint by April 6, 2021.

March 16, 2021

_____
United States District Judge

14